We'll hear argument first today in Case 09-751, Snyder v. Phelps. Mr. Summers. Mr. Chief Justice, and may it please the Court, we're talking about a funeral. If context is ever going to matter, it has to matter in the context of a funeral. Mr. Snyder simply wanted to bury his son in a private, dignified manner. When a Respondent's behavior made that impossible, Mr. Snyder was entitled to turn to the tort law of the State of Maryland. Are we just talking about a funeral? That's one of the problems I have with the case. There was also this video that your client watched, right, later, after the funeral. There was a flyer that was sent out prior to the funeral. We have the funeral, and we have what they described as the epic, which was put on the Internet afterwards. Scalia Well, what does that have to do with the funeral? Mr. Snyder As the district court explained, and the circuit court followed their logic, and I think the facts at trial confirm this, that the epic was essentially a recap of the funeral protest itself. Scalia That's fine, but it does not intrude upon the funeral. I mean, you know, you either have two separate causes of action. One is the intrusion upon the funeral, and the other is the harm caused by viewing this posting on the Internet. But I don't see how they both relate to intrusion upon the funeral. And they were just submitted to the jury as one big lump, right? Mr. Snyder Well, we had the flyer that was submitted that was sent out before the funeral. We have the facts of the funeral. And, yes, the epic did. Of course, we focused on the personal targeted comments in the epic when we presented our evidence. But, yes, it was a funeral. Scalia Suppose there hadn't been a funeral protest, just the epic. Would that have supported the cause of action you assert here? Mr. Snyder I think that's a closer call. But when we have the personal. Scalia Yes or no? Mr. Snyder I would say yes, because we have the personal targeted epithets directed at the Snyder family. Scalia Even though it's he doesn't have to watch them. They are just posted on the Internet. Mr. Snyder That's correct, Justice Scalia. Scalia It's his choice to watch them. But if he chooses to watch them, he has a cause of action because it causes him distress. Mr. Snyder Well, he has a cause of action. That doesn't mean he's going to win. We still have the pleading standards, the summary judgment standards, and the motion to dismiss. Ginsburg But why does he have a claim? As I understand it, after this case arose, Maryland passed a statute putting time, place, and manner restrictions. I read that statute, and it seems to me that there was nothing unlawful, nothing out of compliance with that statute that was done here. I mean, there was considerable distance. There was no importuning anyone going to the funeral. It stopped before the funeral. The service began. Am I right that under the current statute, this conduct was not unlawful? Mr. Snyder Justice Ginsburg, the statute wasn't in place at the time, but it's a complicated answer to the question because they were positioned about 30 feet from the main vehicle entrance to the church, and they rerouted the funeral procession, so they were 200 to 300 feet away from the church. Ginsburg But didn't they stand where the police told them to? Mr. Snyder Well, they told the police where they wanted to stand, and the police said okay. So the police didn't say, please stand here. They said, in fact, they sent out a flogger. Ginsburg But they were there to the knowledge of the police and with the permission of the police. Mr. Snyder It's true. They did not violate any criminal statutes. Alito Is there anything to suggest that the Maryland legislature in enacting that statute intended to occupy the field of regulations of events that occur at funerals? Mr. Snyder I believe the Maryland legislature made it clear that they didn't want people to protest funerals in general.  But they didn't prohibit it. Mr. Snyder They didn't prohibit it under certain circumstances. Ginsburg Which this case, which the facts here meet. Mr. Snyder for statutory enforcement. But what we're dealing with here is tort law. Scalia Well, I believe that statute applies to any protest at funerals, protesting the Vietnam War, protesting whatever. Your case involves, at least if we accept your version of it, a protest of the dead soldier who is going to hell and whose parents have raised him to go to hell. So simply to say you can have a protest within a certain distance is not to say you can have a protest within a certain distance that defames the corpse. That's a different issue, isn't it? Mr. Snyder That's our position, yes, Justice Scalia. And it doesn't Ginsburg You knew just what was going on. Do you suppose, because this has been done before, in fact, wasn't it the very same day they picketed at Annapolis and at the state capitol? Mr. Snyder They picketed, yes, those three locations that day. Ginsburg So they knew what the signs were going to be. Could they have gotten an injunction, do you suppose, against this protest? Mr. Snyder I don't think they could have beforehand, because although you said we knew what the signs were going to be, generally, from their pattern, I think we could guess what the signs may have been, but you don't really know what the signs are going to be until they show up. For example, in this case, they had a sign that said, pre-straight boys. They had a sign that said, God hates you, you're going to hell. Ginsburg Well, you could go into court and say the signs were this, that, and the other thing at the state capitol, the same signs at Annapolis. They're going to use the same signs at this protest. As Justice Ginsburg, from our perspective, the signs that said, God hates you, you're going to hell, referred directly to Matthew Snyder, and we would hope and believe that the district court could enjoin those types of specific targeted epithets. If, for example, this was done at a public park in Montana, logically, I think you could conclude that it wasn't directed at the family. But when you show up at a 20-year-old Marine's funeral and say you're going to hell ---- Ginsburg Did they have a going to hell sign at the state capitol and Annapolis? They had the majority of the signs were the same. The particular ones that you mentioned, did they have those at the other two? Yes. I believe the only ones that they changed were they have a sign for each different branch of the service. Matt was a Marine. Ginsburg So it sounds like to you it was the whole society, the whole rotten society in their view. If we're forced to accept their view, yes, Justice Ginsburg, that's what they testified to. Mr. Snyder's view, the view of the Fourth Circuit, was that these God hates you and you're going to hell signs specifically referred to Matthew Snyder. And the thank God for dead soldiers, Mr. Snyder certainly interpreted that as referring to his son, because after all, Matthew Snyder was the only deceased Marine slash soldier at the capitol. You said the Fourth Circuit found that those signs targeted the family rather than the whole U.S. society? The God hates you and you're going to hell sign were the ones that the Fourth Circuit said they can avoid that issue, because they can simply say this was hyperbolic and protected pursuant to its interpretation of Milkovich under defamation law and then its extension of Hustler v. Falwell. Do you think that the epoch is relevant as an explanation of some of these arguably ambiguous signs that were displayed at the funeral? For example, you're going to hell, God hates you, who is you? If you read the epoch, perhaps that sheds light on who you is. It can shed light, but if you put this in the context of a funeral goer, who is going to hell, Justice Alito, what you have is, it was a typical funeral, family members driving in and. Well, yes, but the signs say you, and the argument is made you doesn't mean Matthew Snyder, it means a larger group, and then you have the epoch, which is directed directly at Matthew Snyder. Doesn't that show, shed light on what you meant on those signs? Correct. And that's where I was going to go with that, Justice Alito. The epoch specifically referenced Matthew Snyder by name, specifically referenced Matthew's parents by name. So in our judgment, and the defendants testified that the epoch sort of explained, at least in their explanation, explained the funeral protest itself. I'm not certain that this is about a funeral. I mean, I understand there was a funeral in it, but the First Amendment question seems to me a different, possibly a broader and different question. Did your client see the signs? I gather from the record he didn't see what the signs were. He just saw tops of signs. So he didn't read anything on the signs. Is that right? He didn't read the content. No. So he hadn't seen it. So how does — how did your client find out that the signs, the tops of which he saw at the funeral, when the demonstrators were standing with the approval of the police 300 feet away, how did he find out what they said? Your Honor, two days in advance, they sent out a flyer announcing they were going to protest the funeral. They had Matthew Snyder's picture there. They claimed they were going to protest at St. John's Catholic doll kennel. Did they say in the — my question is, how did your client find out these very objectionable things on the signs? How did he find out what they said? He found out about the specifics of the signs by going to the family wake immediately following and seeing it on the television. Okay. So now we have two questions. One is, under what circumstances can a group of people broadcast on television something about a private individual that's very obnoxious? And you, because of the funeral, you say that I accept that from your point of view, that is very obnoxious. And the second is, to what extent can they put that on the Internet, where the victim is likely to see it, either on television or by looking it up on the Internet? Now, those are the two questions that I'm very bothered about. I don't know what the rules ought to be there. That is, do you think that a person can put anything on the Internet? Do you think they can put anything on television, even if it attacks, say, the most private things of a private individual? Does Maryland's — does Maryland's law actually prohibit that? Do we know it does? And what should the rules be there? Have I said enough to get you talking? Yes, Your Honor. Right now, the rule we're stuck with is Hussler v. Falwell for intentional infliction of emotional distress. And the — Ginsburg. Your claim is that Hussler was a — Falwell was a public figure, and the Snyder family is not. So I think what I got from your brief is, you don't fall under that case because you're not dealing with a public figure. That's correct, Justice Ginsburg. Okay. So go ahead. Were you finished answering Justice Breyer? I want to — the more you say about this, the happier I'll be, because I'm very — I'm quite interested. The private targeted nature of the speech, in our judgment, is what makes it unprotected. So, for example, the epithets directed at the family would be unprotected. If, for example, a person repeatedly put on the website that Mr. Smith has AIDS, whether it's true or not, essentially, at some point in time, it might rise to the level of an intentional infliction of emotional distress. There would have to be other facts combined there. So you have no objection if the sign said, Get out of Iraq, or antiwar protests. In other words, not directed at this particular individual. Correct. I don't think it would have been. So no objection there. I don't think there would be any constitutional impediment to bringing — or the Constitution would not — would bar that claim from going forward. So the intrusion upon the privacy of the funeral is out of the case then, right? Because that sign would intrude upon the privacy of the funeral just as much. That's not really what you're complaining about. You're complaining about the personal attacks, aren't you? Yes, Justice Scalia. And I think under a certain scenario, you could have, regardless of the signs, you could have a scenario where the funeral was disrupted, and it was disrupted in this case. It was or it wasn't? It was, Justice Ginsburg. I thought that when the service itself began, the protest is stopped. The police testified that I think it was about 8 minutes after the funeral started that the protesters left the area. Were they conferred? Did they have to come in a different entrance? Is that the extent of the disruption? Well, according to, I believe, all the witnesses, yes, they had to come in. In order to avoid the protest. That and they certainly took away, according to the priest that was coordinating the mass, they certainly took away the peaceful experience that all private figures But you wouldn't have objected to that if there weren't these nasty signs, you've just said, right? No, I hope I said, Justice Scalia, that under the right context, just the signs alone, if that's all we're saying, there's a sign out there that says, God hates America, I don't think that we could have a claim there. But if they, in fact, disrupted the funeral, I do think that in some set of facts there could be a claim. All right. Counsel. I'm trying to tease out the importance of the private, whether the person is a private person or a public figure. Does it make a difference if I'm directing public comments to a public or private figure? Well, in the context of defamation, we had the Rosenblum followed by the Gertz decision. No, I'm talking about in terms of infliction of emotional distress. If I am talking to you as a Marine, if you were a Marine, and I was talking about the Iran war and saying that you are perpetuating the horrors that America is doing and said other things that were offensive, would you have a cause of action because you are being called a perpetrator of the American experience? I think there would have to be a lot more facts involved, harassing type of facts. The other thing is that you're saying, yes, so public speech, speech on a public matter, if directed to a private person, should be treated differently under the law? I think that was part of what Justice Breyer was asking. Is that what your position is? Public speech, even directed to a private figure, should be treated differently than as directed towards a public official. All right. And under what theory of the First Amendment would we do that? What case would stand for the – our case, stand for the proposition that public speech or speech on a public matter should be treated differently depending on the recipient of the speech? Gertz v. Welch treated the public v. private figure status different. That was defamation, wasn't it? That's defamation. That's false truth or falsity. Correct. Correct. But the problem is the only other case we have that deals with intentional infliction of emotional distress from this Court is Husser v. Falwell, and Husser v. Falwell clearly dealt with a public figure. The States have interpreted Husser v. Falwell as not applying to a private figure. But have they done it in the context of differentiating between public and private speech? Yes. There's a Illinois case that we cited in the brief where it was specifically said it was a matter of public concern, and they said the plaintiff was not a public figure, therefore, the – just you have to meet the elements of intentional infliction. I wasn't talking about State cases. I was talking about a Supreme Court case that suggested that we would treat – we would treat the First Amendment and the right to speak on public matters differently depending on the person to whom it was directed. I think Gertz v. Welch says that. Dun & Bradstreet says you have to at least look at the context of the situation. Well, it always goes to the context. Now, going to the context of this speech, do we look at the words on the sign alone or do we look at the entire context of what all of the other signs said at the demonstration to determine whether or not the speech here was public or private speech? I think you have to look at the particular signs, because if you don't, anyone could come up with a public concern because they could direct any type of epitaphs at a person. In the middle of their paragraph, they could say, I'm for taxes or I'm against taxes, and therefore, the entire statement. Scalia. Just to summarize, I'm a little concerned at your apparent acceptance of the proposition that if one comes up to a Marine and says you're contributing to a terribly unfair war, that that alone would form the basis for the tort of intentional infliction of an emotional distress. What are the requirements for that? I thought that it had to be outrageous conduct. Doesn't it have to be outrageous conduct? It does, Justice Scalia, and I wasn't suggesting that. I mean, why accept that as parallel to what you're claiming here? And I hope I didn't. What I meant to say, if I didn't, was there would have to be a lot more facts involved to rise to the level of an intentional infliction of emotional distress case if you just told the Marine, for example, you're not in favor of the war. Breyer. What about the taking of the law? If you have an instance where the defendant has said on television or on the Internet something absolutely outrageous, you show that, you show that it was intended to and did inflict serious emotional suffering, you show that any reasonable person would have known that likelihood, and then the defendant says, yes, I did that, but in a cause, in a cause, and now in a cause that we're trying to demonstrate how awful the war is. At that point, I think the First Amendment might not leave this alone. But if it's not going to leave this alone, there is where we need a rule or we need an approach or we need something to tell us how the First Amendment in that instance will begin to enter and force a balancing. Is it that you want to say no, no punitive damages in such a case, or that you'd have to insist upon a particularly clear or a reasonable connection between the private part of this and the public effort? Have you thought about that at all? Because that's where I am thinking and having trouble. I think the standard should be Hustler v. Falwell generally does not apply to the defendant. Hustler v. Falwell is defamation. I thought Hustler v. Falwell was intentional. It is. Intentional infliction. Okay. Good. Thank you. Go ahead. Mr. Summers. Well, answer then, please. I think the rule should be Hustler v. Falwell generally does not apply to a private figure unless the defendant shows some compelling connection there. If you or at least a reasonable, rational connection. In this case, they don't even claim there is a connection. They just use this moment to hijack someone else's private event when they are grieving over a 20-year-old child's funeral. Mr. Summers, Hustler seems to me to have one sentence that's key to the whole decision. And it goes like this. It says, How does that sentence, how is that sentence less implicated in a case about a private figure than in a case about a public figure? Well, at least in Hustler, Justice Kagan, at least in Hustler v. Falwell, we had a traditional   We had a case about a private figure. public discourse. We had a parody. I believe the opinion went to great length to explain that. Here, what we are talking about is a private funeral. I don't, I would hope that the First Amendment wasn't enacted to allow people to disrupt and harass people at someone else's private funeral. But that goes back to the question that was asked previously about, suppose you had a general statute that just said there will be no disruptions of any kind at private funerals. You know, pick your distance, 500 feet, 1,000 feet. But something that didn't refer to content, that didn't refer to ideas, that just made it absolutely clear that people could not disrupt private funerals. What harm would that statute not address in your case? Well, the States have, in the statutory case, they have the interest of penalizing the offending party. In tort law, the State's interest is to provide a remedy for its citizens. Under the Four Circuit's interpretation of these facts, Mr. Snyder has absolutely no remedy, none. He's a private figure, a grieving father, and he's left without any remedy whatsoever. Do we have other instances where conduct is lawful, meets all the terms of the statute that meant to govern protests at funerals, and yet there is an award of damages permitted? I believe that the Hustler v. Falwell was a — had several tort claims, but there was no criminal statute violated. I understand that it went the other way because of the public figure status, but that would be an example. Another example. But that was a — I'm asking you for an example where a Federal case where the conduct was permitted by the statute, by the police who were there, and yet there was a damage award. Justice Ginsburg, I'm not aware of any case, but I think the — if, for example, someone sued someone for defamation, there probably wouldn't be a statute that was violated, so I don't — I'm talking about this intentional infliction of emotional distress claim that you're bringing. Other than Hustler v. Falwell, I do not have any Federal cases to cite to you. The State cases we cited in our brief. Alito, is this a situation in which all conduct that complies with the Maryland funeral protest statute is lawful, that the Maryland legislature said, this is the — these are the exclusive regulations that apply here, so that if someone came up to Mr. Phelps at the funeral and spat in his face, that would not be — that wouldn't be illegal? Justice Alito, I don't know whether that would be criminally— Sotomayor, I don't know whether that would be criminally prohibited by the statute. Well, it certainly wouldn't be because of the distance. I mean, you'd have to be a lot closer than the Maryland statute allows to spit in somebody's face. Well, perhaps you'd like to answer Justice Alito's question. I believe that you could commit a tort and still be in compliance with the criminal code, Justice Alito. Mr. Summers, can I — can I ask you, suppose — suppose I don't think you have a cause of action for invasion of privacy when these people were at this distance from the funeral, but that was one of the causes of action submitted to the jury. If I disagree with you on that cause of action, I suppose I'd have to say there has to be a retrial now. Of course, this Court could do that, Justice Scalia. So you have to support both causes of action here, the intentional infliction of emotional distress and the invasion of privacy, right? Yes, Justice Scalia, but according to the Fourth Circuit, we'd agree that the Respondents waived that issue by not appealing that issue. Waived what issue? The invasion — elements of the invasion of privacy. They didn't contest that we met the elements of the tort. They contested the constitutional issue, but not whether or not we met the elements of the tort. All right. Okay. And could I reserve the remaining time? Thank you, counsel. Ms. Phelps. Mr. Chief Justice, and may it please the Court, when members of the Westboro Baptist Church entered an ongoing, extensive public discussion and wide array of expressive activities taking place in direct connection with the deaths and funerals of soldiers killed in Iraq and Afghanistan, they did so with great circumspection, and they did so with an awareness of the boundaries that have been set by the precedents of this Court. Ms. Phelps, suppose — suppose your group or another group or — picks a wounded soldier and follows him around, demonstrates at his home, demonstrates at his workplace, demonstrates at his church, basically saying a lot of the things that were on these signs or — or other offensive and outrageous things. And just follows this person around day to day. Does that person not have a claim for intentional infliction of emotional distress? Any non-speech activity like stalking, following, importuning, being confrontational could indeed give rise to a cause of action. Demonstrations outside the person's home, outside the person's workplace, outside the person's church. Demonstrations, not disruptions, but saying these kinds of things. You are a war criminal. Whatever — whatever these signs say, or worse. Phelps, my answer, Justice Kagan, is no, I don't believe that that person should have a cause of action or would under your cases have a cause of action. You couldn't give that cause of action without direct reference to the viewpoint, which is exactly what happened in this case. Scalia. My goodness, we did have a doctrine of fighting words, and you acknowledged that if somebody said, you know, things such as that to his face, that wouldn't be protected by the First Amendment. We agree that fighting words are less protected under the First Amendment. Unprotected. I'll go with unprotected, Justice Scalia. And if I may add this, fighting words require eminence, they require proximity, and they require a lack of those words being part of a broader political or social issue. Scalia. Is that so? Do we know that? I beg your pardon? Scalia. Do we know that? Is it the criterion of the fighting words exception to the First Amendment that there be an actual fight? Certainly not that. Is it a requirement that there be a potential for a fight? I doubt it. Where do you get the notion that there has to be an imminent fight? I get the notion from the series of cases starting within seven years after your Chplinsky case with the Gooding case and on down through the Brandenburg case. Which say what? That say that the person was too remote, the fight was not imminent? The definition, the working definition of fighting words is that they have to be words which by their nature are likely to incite an immediate breach of the peace and not occur in the context of some social, artistic, educational, political kind of speech. And if I may hasten to add, Justice Scalia, these Respondents were not charged with fighting words. The jury was not instructed to limit themselves to fighting words. No element of the torts under which liability attached included fighting words. The words that were at issue in this case were people from a church delivering a religious viewpoint, commenting not only on the broader public issues that the discussion was underway in this nation about dying soldiers, about the morals of the nation. But, Ms. Feldman, you don't have to say anything else about that, but I'm just going to say that there's no question that these signs, I mean, the signs like that we saw during the Vietnam War. But you had the demonstration at the Capitol, and you had the demonstration at Annapolis. This is a case about exploiting a private family's grief. And the question is, why should the First Amendment tolerate exploiting this bereaved family when you have so many other for getting across a message the very same day? And the question is, why should the First Amendment tolerate exploiting the bereaved family when you have so many other for getting across a message the very same day? You did. Right. So several pieces to that, Justice Ginsburg. When I hear the language exploiting the bereavement, I look for what is the principle of law that comes from this Court. And the principle of law, as I understand it, is without regard to viewpoint, there are some limits on what public places you can go to, to deliver words as part of a public debate. If you stay within those bounds, and under these torts even, this notion of exploiting, it has no definition in a principle of law that would guide people as to when they could or could not. And if I may. Alito, and with a little bit more from your cases, if I may, and not under an inherently subjective standard, and where your only argument is that the First Amendment never allows a claim for the intentional infliction of emotional distress based on speech, unless the speech is such that it can be proven to be false or true, is that your argument? With a little, yes, Justice Alito, and with a little bit more from your cases, if I may, and not under an inherently subjective standard, and where you're only claiming that the impact of the speech was adverse emotional impact. All right. Well, Justice Kagan gave you one example. Let me give you another example along the same lines. Let's say there is a grandmother who has raised a son who was killed in Afghanistan or in Iraq by an IED, and she goes to visit her son, her grandson's grave, and she's waiting to take a bus back to her home. And while she's at the bus stop, someone approaches and speaks to her in the most vile terms about her son. He was killed by an IED. Do you know what IEDs do? Let me describe it for you. And I am so happy that this happened. I only wish I were there. I only wish that I could have taken pictures of it, and on and on. Now, is that protected by the First Amendment? There's no false statement involved, and it's purely speech. Right. And it may give rise to some fighting words claim, depending on the proximity and the context. And I would have to know what that is. Well, it's an elderly person. She's really probably not in a position to punch this person in the nose. She's a Quaker, too. Let us assume that the grandmother had not done what Mr. Snyder did in this case. Mr. Snyder, from the moment he learned of his son's death, went to the public airwaves multiple times in the days immediately before and immediately after. So what is your answer to Justice Alito's question? Do you think the First Amendment would bar that cause of action or not? There would have to be a very narrow circumstance where it didn't, Mr. Chief Justice. So you think there are situations where a tort of intentional infliction of emotional distress is allowed even for a matter of public debate? Not public debate, Mr. Chief Justice. That is not the way I understood the hypothetical he gave. Well, I understood the hypothetical, that the person disagreed with the war in Iraq and the sending of American troops there. And knew that this elderly woman was the grandmother of a soldier, and I would ask the question in the hypothetical how they knew, which is why I was making reference to what Mr. Snyder did. The person selects the grandmother because he thinks that will give maximum publicity to his views. Now, is that the First Amendment bar that cause of action or not? If the grandmother entered the public discussion, the First Amendment bars it. No, it's just as Justice Alito posed. The grandmother was returning from the grave of her grandson. She didn't enter the public discussion at all. So I'm anxious to determine whether in those circumstances you think the First Amendment allows that cause of action or not. I'm reluctant to say that it does not, Mr. Chief Justice. However, if there was. But you gave the answer before about you said stalking. Right. Isn't this comparable to stalking? And that's what I was trying to liken it to, and that's what it sounds more like to me. Do you think it satisfies the normal tort or law against stalking for someone to come up to an individual and engage in discussion? I thought a lot more was required. Well, Mr. Chief Justice, I would not file that claim for that person, for that elderly grandmother. I'm not prepared without knowing more to say absolutely there could be no cause of action. What I am prepared to say is there was absolutely much more than that in this case. Well, if that's a possibility, there's a claim there, then what distinguishes that from this case? Now, I thought you were beginning to say that my hypothetical is different because Mr. Snyder made his son into a public figure. And the question I wanted to ask in that connection is whether every bereaved family member who provides information to a local newspaper for an obituary thereby makes the deceased person a public figure. Not the deceased person, Justice Alito. We don't allege that the young man dead was a public figure. We do. But if the grandmother called up the local paper and said let me tell you something about my grandson who was just killed in Iraq, you know, he liked football and camping. That makes him — that makes her a public figure? It's getting closer. And, Justice Alito, if she went on then to say, and how many more parents like me and my ex-wife are going to have to suffer this way, and when will this senseless war end? And I've gotten Congressman Murtha on the phone and talked about this situation. And I'm against the war. And then proceeded to repeat that question in the public airwaves repeatedly. Then a little church where the servants of God are found say, we have an answer to your question that you put in the public airwaves. And our answer is, you've got to stop sinning if you want this trauma to stop happening. Your response to Justice Alito is dwelling on the facts of this particular case. Yes, sir. I'm interested in knowing what your position is on the broader question. Can you imagine a circumstance where this same type of discussion is directed at an individual and yet would give rise to the tort of emotional distress? I can imagine, Mr. Chief Justice. I'm sorry, can or cannot? I can. I can imagine that there could be a circumstance, a hypothetical, where there was not this level of involvement, and it was out of the blue, and it was up close, if I may use the term, complication. Okay. So if you recognize that there can be a tort of emotional distress in circumstances like that, isn't that the factual question of whether it rises to that level of outrageousness, which is part of the tort for the jury? I don't agree with that, Mr. Chief Justice, because you've now taken an inherently subjective standard with the absence of any of these non-speech misbehaviors. And now you are back to only the only barrier between a person and their First Amendment right to robust public debate, including, this Court has said, outrageous statements. Does it make it? I'm sorry. With just that subjectively inherent standard and that subjective statement of emotional impact. This Court has said repeatedly, we won't have that. Does it make a difference, which seems to me to be the case here, that Mr. Snyder was selected not because of who he was, but because it was a way to get maximum publicity for your client's particular message? That is not accurate, Mr. Chief Justice, with due respect. Well, assuming it is accurate, does that make a difference? The motive of the speaker to get maximum exposure, which every public speaker pines for, looks for, strives for, and is entitled to, does not change the legal principle that's at play. Well, it might affect whether or not the selection inflicts emotional distress for a reason unconnected with the individual who is the subject of emotional distress. In other words, if the person is selected because, as I indicated, it gives maximum publicity, rather than because of a particular connection to the matter of public debate, I wonder if that makes a difference. I think it makes a difference when you're looking at what role the plaintiff had in that public discussion and how tied the words that they seek to punish are to his role in that public discussion. I think that's how you get to the point. Well, Ms. Phelps, let's say that we disagree with you as to whether Mr. Snyder had at all injected himself into this controversy. Or let's take a case where it's clear that the father of the fallen soldier had not injected himself, had not called any newspapers, had not said anything to anybody. But a group knew that this funeral was taking place and was there with the same signs, with the same – are you saying that that makes the difference, that there, there would be a claim? I'm saying it does make a difference, and no, there – but no, there would not be a claim there, in my opinion, because first of all— So it's not a difference that matters. It is a difference that matters in some measure, I believe, Justice Kagan, and this was. I believe that the umbrella of protection under the First Amendment that this Court has established firmly is speech on public issues. Sometimes you get under that umbrella because it's a public official or it's a public figure, but the umbrella that you give the protection for is speech on public issues. Now, when a plaintiff comes to your court and says, I won $11 million from a little church because they came forth with some preaching I didn't like, I think it does make a difference for the Court to look closely at what role did that man have in that public discussion. But your argument depends on the proposition that this is speech on a matter of public concern. Is that correct? Absolutely, Justice Alito. Let me give you this example. Suppose someone believes that African-Americans are inferior, they're inherently inferior, and they're really a bad influence on this country. And so a person comes up to an African-American and starts berating that person with racial hatred. Now, is that a — this is just any old person on the — any old African-American on the street. That's a matter of public concern? I think the issue of race is a matter of public concern. I think approaching an individual up close and in their grill to berate them gets you out of the zone of protection, and we would never do that. So everything is a matter of public concern. That simply — that simply points out that all of us in a pluralistic society have components to our identity. We're Republicans or Democrats. We're Christians or atheists. We're single or married. We're old or young. Any one of those things, you could turn into a public issue and follow a particular person around, making that person the target of your comments and, in your view, because this gives you maximum publicity, the more innocent, the more removed the person is, the greater the impact. The Justice Alito hypothetical in the grandmother case. So I think your public concern issue may not be a limiting factor in cases where there is an outrageous conduct and where there should be a tort. Well, but again, this Court has given substantial, longstanding protection to speech on public issues, and how could it be gainsaid that the dying soldiers is not on the lips of everyone in this country, and it is a matter of great public interest and why they're dying, and how God is dealing with this nation were you to consult the joint appendix and see that at the very same funeral right outside the front door of the church were people with flags and signs articulating the God bless America viewpoint, and so this little church. But your position is that you can take this and you can follow any citizen around at any point. That was the thrust of the questions from Justice Kennedy and Justice Alito, and it seems to me that you should help us in finding some line there. Yes, I will help you, Justice Kennedy, and I'm pleased to do that, because we don't do follow around in this church. We were 1,000 feet away, seven picketers, 1,000 feet away, out of sight, out of sound, not just standing where the police said to stand. But the hypotheticals point out that there can be an intentional infliction of emotional distress action for certain harassing conduct. For harassing conduct, not for speech, not for public speech, Justice Kennedy. But torts and crimes are committed with words all the time. I agree with that. And there's never been any allegation in this case that the words of the Westboro Baptist Church were in any category of low value or less protected speech. Well, that's the point. Let's talk about subjectivity. You're concerned about something. Surely, fighting words is, you know, whether something's a fighting word, that's a very subjective call, isn't it? I believe that your case gives some good light on that, Justice Scalia. You don't think it's subjective? There may be in some people's mind an element of subjectivity. My 20 years of experience. Oh, you think that's solid? Oh, absolutely. What's a fighting word? Whereas what is an outrageous statement is very much different from what's a fighting word? I don't see the difference. Besides which, isn't it the case that in order to recover for the tort of intentional infliction of emotional injury, you have to substantiate the injury with some physical manifestation, which the plaintiff here had. And my goodness, for fighting words, you don't even need that. You can just say, you know, these words angered me to the degree that I would have been inclined to fight. At least for this tort, you have to have physical manifestations. Why isn't that a very objective standard? Well, because the Court said it was inherently subjective in the Falwell case. And I think that the language that Justice Kagan brought forth, and there's a few more paragraphs that follow, identify why it's inherently subjective. And the way this case was tried identifies why it's inherently subjective, where although two signs and then three were identified as actionable by a strained reading of those words, all of the preachments of Westboro Baptist Church, including all of the signs at that picket, all of the signs at other pickets, and all their doctrines, went to a jury with that inherent, inherent subjective standard. Scalia, I must hasten to say this. I am not a fan of the fighting words doctrine. I do think it has problems. I just don't think it applies in this case. The Court has made that a very narrow category, hasn't it? I mean, we have not allowed the fighting words. You say that to me and I'm immediately going to punch you in the nose, because it's an instinctive reaction. I think the Court has rejected spreading fighting words beyond that. And especially not to where there's just emotional injury. That's where I particularly think, although Chplinsky would have suggested in some broad language you'd go that way, you have not gone that way in any of the cases. And again, I have to reiterate, you have required immediacy and an intent. Whether a fight ensues or not, I do understand that hasn't been pinned down as a requirement. But an intent that your purpose is to mix it up with somebody, not to go out and say, nation, hear this little church, if you want them to stop dying, stop sinning, that's the only purpose of this little church. A thousand feet away could not possibly be fighting words. Breyer. We're still worried about the statements on television and on the Internet and the knowledge there. And I'm not — I'm starting — I'm trying to get the same answer from you I was trying — from your colleague. Brandeis said the right to be let alone is the most important. And so he must have been thinking there could be a tort, there for interference with privacy. And the First Amendment doesn't stop State tort laws in appropriate circumstances. Right. An emotional injury deliberately inflicted could be one. All right. Now, and I think it is one. But I see that in some instances that could be abused to prevent somebody from getting out a public message. And therefore, I'm looking for a line. Now, let me suggest a couple, see what you think. Maybe you can think of some others. You could have a judge make the decision, since the First Amendment is involved, not the jury. And the judge could say whether in this instance it was reasonable for the defendant to think that it was important to interfere with the emotional life of that individual. You could say if that was so, there will still be no — there will be no punitive damages. There could be ordinary damages. You could remove all the protection from the defendant in an instance where the defendant nonetheless knew, actually knew that they were going to cause an individual who's private, severe injury, emotional injury, irrespective of their public message. So what I'm doing is suggesting a number of thoughts of ways of trying to do what I'm trying to accomplish, to allow this tort to exist, but not allow the existence of it to interfere with an important public message where that is a reasonable thing to do. Now, maybe this is impossible, this task, but I'd like your thoughts on it. Thank you, Justice Breyer. And I'm taking that we're speaking now of the intrusion claim, and I believe that I could offer you a compare and contrast to extremes that may help us here. On the one hand, you have a body of law that comes under the heading of captive audience, and you can go into that body of law and read all those cases in one sitting, so to speak, from which you would conclude that it is very narrow, it is very limited, and there must be some actual physical, sound, sight intrusion, if you're talking about invasion of privacy. At the other extreme for a compare and contrast is what they seek in this case, what the trial judge gave them in this case, which is, in an unspecified period of time that each individual will call their mourning period, no one, any time, any place, any manner, may say any word that that mourner says caused me emotional distress. That would chill too much speech. Why aren't the members of the family of a deceased a captive audience at the funeral? If we were right outside the door like the other expressers were in these exhibits, they might have been. Your body of law about captive audience, when you, Hill v. Colorado, Madsen v. Schenck, that line of cases recently, taking the picketing, where they, by the way, specifically said at footnote 25, this isn't about content. You've got to be up, again, I'll use the cloak wheel term, up in your grill. The term I think the Court used was confrontational. Now, you can't be a captive audience to someone that you couldn't see when the test is. And I thought the targeted picketing of a person's house is not protected by the First Amendment. Focused picketing per Frisbee directly in front of can be regulated. And even in Frisbee, the Court. And what's the difference between that and picketing around the site of a funeral? Proximity, Justice Alito, because the captive audience doctrine has fleshed out in those was, is it practical for the person to avoid it without having to run a gauntlet? That's why you said image is observable. The only objection you can have there is content, get up and close the blind. So it doesn't have to do with whether this is a, what you characterize as a public funeral as opposed to a private funeral? That's not the distinction you're relying on any longer? Not primarily. I'm primarily relying upon proximity. I do think that you could have a public event where there was not an element of vulnerability in the people going in. You might even let them up in their grill. I don't know for sure, but we don't have to worry about that. Sotomayor, I'm following your arguments that the bulk of your speech in the epic, and even the bulk of your signs, involve public speech. What you have not explained to me is how your speech directed at the Schneiders constituted public speech, or speech about a public matter, because you're talking about them raising Matthew for the devil, teaching him to, I think, defy the Creator, to divorce and to commit adultery. At what point and how do we take personal attacks and permit those as opposed to, I fully accept you're entitled in some circumstances to speak about any political issue you want, but what's the line between doing that and then personalizing it and creating hardship to an individual? I believe, Justice Sotomayor, that the line is where it was in this case, when the father used the occasion of the son's death to put a question out in the public airwaves repeatedly. Sotomayor, so if we disagree that that made him a public figure, if we view him as a private figure, is that enough to defeat your argument? No, Justice Sotomayor. So assume he's a private, that the Matthews are private figures and you did this. So explain to me how you're protected by the First Amendment. If, without regard to what label is put on a person who steps into the public discussion. You want to change my assumption. We assume that he's a private figure. You have now made a public statement and directed personal comments at an individual who's a private figure. Is that actionable? I don't know, Justice Sotomayor. I don't know that I can give you a definitive answer as you framed it. What I can tell you is that I think the Court would have great difficulty making a rule of law that whether you call yourself private, public, limited, whatever, you, not the person you're mad at over their words, but you step into the public discussion and make some public statements, and then somebody wants to answer you. Well, so that, what if, did Mr. Snyder, the father, become a public figure simply because his son was killed in Iraq? No, Mr. Chief Justice. I don't allege that here. If he didn't take out the usual obituary notice, then this case should come out the other way? It's not the obituary notice, Mr. Chief Justice. He went far beyond that. All right. Well, let's just say he does nothing. He does nothing other than bury his son. Right. He is then not a public figure. If he does nothing, we don't picket him, and I don't know for sure. But that's because if he does nothing and it's not publicized, you don't get the maximum publicity that your clients are looking for. My question is, if he simply buries his son, is he a public figure open to this protest or not? I don't know in the context of a war if I can give a definitive answer to that. It was not an issue of seeking maximum publicity. It was an issue of using an existing public platform to bring a viewpoint that was not being articulated. For two years, this Church watched. And what if a parent is called after the — puts in the obituary information and called by the local newspaper and asked for a comment, and he says or she says, I'm proud of my son because he died in the service of our country. Does that — is he stepping into a public debate by doing that? However you call it, Justice Alito, a Church or anybody has the right to answer that public comment. That is our position. Thank you, Ms. Phelps. Mr. Summers, you have four minutes remaining. Thank you, Mr. Chief Justice. Mr. Summers, could I ask you to go back to an answer that you gave to one of my colleagues when you were last up there? You said that a more standard antiwar demonstration, get out of Iraq, war is immoral. At this funeral, same distance, same-sized signs, that a more standard antiwar demonstration would be protected by the First Amendment from an intentional infliction of emotional distress suit. And I'm wondering why that is. If you think that what is — what causes the lack of protection here is the kind of glomming onto a private funeral, the exploitation of a private person's grief, the appearance for no other reason than to gain publicity at a private event. If that's the problem, why doesn't it also apply to a standard, you know, get out of Iraq, war is wrong kind of demonstration? Justice Kagan, I say that is a — one, that's a much closer call, and two, I would look to the facts of the case to see if the funeral itself was disrupted. But that isn't the facts of our case. The facts of our case was, one, that it was disrupted, and, two, that it's personal targeted assaults on Mr. Connery. Suppose it's not disrupted. And suppose — and I know that this is — that you contest these facts — that yours wasn't disrupted, that they stopped when you started, that they were a sufficient number of feet away from the funeral and so forth. So we're just talking the fact that there are people who have — who are appropriating and taking advantage of a private funeral in order to express their views. And they are in compliance with all the content-neutral rules. I'd say that's a much closer call and not the — Well, why is it a closer call? It's a closer call because it's not the personal targeted nature of the attack on the Snyder family that we have in this case. So does that mean that now we have to start reading each sign and saying, war is wrong falls on one side of the line, but you are a war criminal falls on another side of the line? Is that what we would have to do? I think that, generally speaking, yes, Justice Kagan. The court, the district court, would have to look at the signs, as the district court did in this case, and determine which one he believed were directed at the family and which ones were not. There was a comment earlier that all the signs were presented — well, all the signs were presented by the Respondents, not by Mr. Snyder. So we focus on the signs. I guess that that kind of a call is always necessary under the tort that you are relying upon. The conduct has to be outrageous, right? Correct. That always requires that kind of a call, unless the tort is unconstitutional, as applied to all harm inflicted by words. Correct, Justice Scalia. The element of intentional infliction of emotional distress requires outrageousness. Well, that's true. But I was assuming a situation in which a jury found that the war is wrong. The jury did find that outrageous, and the question was, were we going to reverse that jury verdict because we — because the First Amendment prohibited it? Again, I believe that's a closer call, and I would say yes. If it's a general statement, does not disrupt the funeral, does not target the family, I'd say that it's one, a much closer call, and yes, it's more likely that the Constitution is going to prevent that claim from going forward. The — I say that I'm — Thank you, Mr. Summers. The case is submitted. Thank you, Mr. Chief Justice.